# THE PREROGATIVE COURT

OF

## THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1882.

Theodore Runyon, Esq., Ordinary.

J. Harvey Barker, executor, proponent, appellant.

*v.*

Jacob Barker, caveator, respondent.

Evidence that testatrix, after she made the will in question, denied that she had made a will, and said she would not make any, but would leave her children to share equally in her property, while it is competent to show that the will is spurious, and that the testatrix had not testamentary capacity, is not competent to show undue influence.

Appeal from decree of Warren orphans court.

*Mr. L. De Witt Taylor*, for appellant.

*Mr. Nicholas Harris*, for respondent.

THE ORDINARY.

This is an appeal from the decree of the Warren orphans court, refusing to admit to probate a paper writing, purporting to be the will of Mrs. Anna M. Barker, deceased. The instrument is dated April 2d, 1880. The testatrix died in May of the following year. When the will was made, and thenceforward to the time of her death, she was living in her own house with her son, James H., commonly called Harvey, Barker, and his little child, a lame girl, who, at the date of the will, was about ten years old. Harvey was a widower. The testatrix had several other children, one of whom was Jacob, the caveator, with whom, or with whose wife, she seems to have been at variance, and there is some evidence that she was not on good terms with others of her children. The will was drawn by Isaac M. Read, a neighbor. By it, after providing for the payment of her debts and funeral expenses, she gave to her son Harvey all her property for life, providing that if the personal property should be insufficient for his support, he might dispose of the real estate as he might think best, and that at his death the property should go to his daughter, the little girl before mentioned; and she appointed Read and Harvey executors of the will. The will is propounded by Harvey for probate. The estate seems to be small. It consists of a house and lot in Jacksonburgh, in Warren county (the lot containing about an acre), and about $1,200 in money and household goods. Mr. Read, who drew the will, as before mentioned, testifies that it was drawn in her house at between eight and nine o'clock in the evening of the day on which it was signed; that he received from his wife information that the testatrix wanted him to go to her house, and he went there accordingly; that that was the first that he had been spoken to about drawing the testatrix's will, and that when he arrived there the testatrix told him she

Barker *v.* Barker.

wanted him to write her will, and how she wanted it, and that he wrote it right there in her room ; that she mentioned whom she wanted to be the executors ; that when she told him how she wanted the will, he desired her to get some one else to write it, but she said she wished him to write it ; that she said that Harvey was the only one that had ever done anything for her, or taken care of her ; that when he was away she would become needy, and that she had sent to Jacob's for some flour, and that they had refused her, and would do nothing for her, and that she had got Harvey word at that time, and that he came over, or sent over some money to her ; that Harvey had helped her to get the money, and that she wanted him to have the use of it for his lifetime, and that she wanted that crippled child of his to have it.   He says he does not know that she gave any reason why she did not give anything to the others ; that he spoke to her about her daughter, Susan Swisher, and said that she had been there to the house a good deal, and had been kind to her, to which the testatrix assented, adding that she had paid her for it, or something to that effect.   Mr. Read says he has known her about twenty years, and, as before stated, he was a neighbor.   The other witness was also a neighbor, Mr. Elias E. Beegle.   Mr. Read says that the testatrix was in her own house when she signed the will ; that he saw her make her mark in her name there, and that Beegle was present at the same time ; that he, Read, read the paper to her before she signed it, and that she acknowledged that it was her last will and testament before she executed it, in the presence of himself and Beegle ; that she requested Beegle to witness it, and that he, Read, signed his name there in the presence of the testatrix and of Mr. Beegle, the other witness, and that Mr. Beegle signed his name in his presence and that of the testatrix.   He further says that, in his judgment, she was, at the time she executed the will, of sound and disposing mind and memory.

He further says that in making her mark she held the pen in her own hand, but he does not remember which hand it was ; that it was a steel pen, and that she held it without any assistance ; that though she had been paralyzed on one side of her

body (he does not know on which side), she had the use of one hand. He further says he thinks she suggested the name of Mr. Beegle as a witness; that he mentioned Mr. McConachy as a witness, but she did not want him; that he then mentioned Elias J. Snover, but she said she did not care to have Mr. Snover, and then she said, "Send for Elias Beegle," and spoke about Beegle having done some writing for her; and that he then sent Harvey to tell Beegle to come. He testifies that no one else was present, and that Harvey was not in the room while he was there. He also says that the testatrix suggested his name as executor; that he asked her whom she would have for executor, and she answered that she had thought of him and Harvey, and that she wanted them to be the executors. It appears from his testimony that when he first went to her house on that evening he went to see what she wanted of him, and that when she told him what she wanted he went to his own house, which was only a few hundred yards away, and got paper, pen and ink to draw the will, and returned to her house, and then drew the will. He swears that she told him just how she wanted the will, and that he wrote it just as she wanted it; that she told him how she wanted her property distributed; that she spoke about the crippled grandchild, Harvey's daughter, and that he said, "Mrs. Barker, don't you want to leave anything to the rest?" and that she answered "No," and gave her reasons why she wanted it so, mentioning her son Jacob's name. He further says she spoke about several of her children, not the one living at Newton (William), and spoke about her daughter Jane going away mad, angry. He also says she did not mention her daughter Fanny or her grandchild in Illinois. Her children appear to have been Jacob, William (living in Newton), Fanny, Jane Danly, James Harvey, Susan Swisher, Mary Ann Drake, and a deceased daughter, who left three children. He further says that after he wrote the will he read it over to her slowly, and then asked her if that was the way she wanted it, and that she said it was. It also appears from his testimony that she had been paralyzed for a long time, and that he had been in her house to see her probably four or five times after she was stricken with paralysis. He

says the visits were three or four days, or three or four weeks apart, and that he had not seen her in three or four weeks when he drew the will. He also says that he never talked with Harvey about writing the will, nor did Harvey talk to him on the subject. He swears positively that she made the cross for her signature. Mr. Beegle, the other witness, lived within a hundred and fifty yards of the testatrix. He swears that he signed his name as a witness to the will at the testatrix's request, and saw her make her mark on the will; that Read was present at the same time; that before she made her mark she acknowledged it as her last will and testament, and that Read signed his name there at the same time in his presence and that of the testatrix; and that he, the witness, signed his name also as a witness to her execution of the will at the same time. On cross-examination he says that Harvey came to his house about nine o'clock that evening and told him that his mother wanted to see him. He further says that the will was executed twenty or thirty minutes after he went into the house; that the body of the will was written when he got there, but the attestation clause after he arrived there, and before she signed it; that he thinks she held the pen alone; and he further says that to the best of his knowledge she was of sound mind at the time she executed the will. He adds that he witnessed a paper for her in regard to drawing her pension-money afterwards, and that she seemed to know what she was about. It has already been remarked that she lived more than a year after the date of the will in question.

The caveator opposes the will on the ground of incompetency and fraud. He insists that at the time when it purports to have been executed, and when Beegle and Read both swear it was executed by the testatrix, she was in bed suffering from a severe stroke of paralysis, and unable by reason of that disease to make a testamentary disposition of her property. It follows, necessarily, if such was her condition at that time, that Read and Beegle and Harvey have not only testified falsely, but that they were guilty of a conspiracy to dispose of the estate of the testatrix by a spurious will. The caveator produces Dr. Johnson, the physician who attended the testatrix in her sickness. He

Barker *v.* Barker.

testifies that he had been her family physician for twenty-five years; that he remembers her having a stroke of paralysis the last of March, 1880; that he was called to see her on the last day of March, which was Wednesday; that she had threatening symptoms; that she was sitting on a chair, and her son Harvey was with her; that on Friday, two days afterwards, he was again called to see her and found her in bed, with a decided and entire paralysis of her right side; that her mental condition was a sort of stupor, and he gives it as his opinion that she was not then able to hold a pen in her right hand, and that at the time of the day when he saw her, which was about noon, it was necessary to arouse her to get her to attend to any business, and that if she attended to any important business on that day, it would have been necessary that it should have been previously mapped out in her mind.    It appears from his testimony that the stupor of which he speaks continued for a whole week, but after that he says her mental condition was very fair.   He adds that she was naturally a reticent woman, and would not carry on much of a conversation at any time; that her ordinary manner was merely to answer such questions as were put to her.   Rebecca Swisher, the mother-in-law of the testatrix's daughter Susan, and Susan both testify that they were at the testatrix's house on the 1st day of April, the day preceding that on which the will was executed; that they were there in the afternoon of that day, and that the testatrix was unable to carry on any conversation with them, and that Susan tried to talk with her but she did not make any reply.   Susan says she was there again on the 3d of April (Saturday), and that her husband and child went with her, and that on that day the testatrix was very sleepy, and knew nothing; that she, the witness, stayed until Sunday afternoon.   She further says that Elias Snover was there on Saturday night.   Mrs. Elsie A. Snover and her husband, Elias Snover, just referred to, both testify to having been at the testatrix's house at the time of this sickness.   Mrs. Snover says that she was there about the 1st of April; that she was there, as far as she can fix the days, on the 3d and 4th; that she remembers those two days particularly, and thinks she was there before.

She says she had been in there, but does not remember the days, and does not remember the day when the testatrix was taken sick; that Dr. Johnson was attending her while the witness was there; that it was some time in the afternoon that she went there, on the 3d of April; that she saw the testatrix, who was lying in bed, and that she lay in a very stupefied condition. It will be observed that this witness does not speak positively as to any day, but says as nearly as she can fix the days, she was there on the 3d and 4th of the month. Her husband says he thinks he was there on the 1st, but is not positive. He testifies that he was there on the 2d, 3d and 4th; that he thinks he was there in the forenoon of the 2d, and was there just at night; and he testifies to the condition of the testatrix. He says she was in a very feeble condition, drowsy, and he did not think she noticed what was going on while he was there; that she did not appear to notice what was going on; that he first spoke to her referring to her bad condition, and he could hardly understand what she said; that she roused up and said something, but he could hardly understand what it was; that she could hardly speak, and did not offer to converse with him, but he said nothing more to her; and that this was before supper, and after supper he went back again, but said nothing more to her. He swears it was between eight and nine o'clock at night when he went away the last time, and that Harvey was there when he went away; that he does not remember that any one else was there, and that there did not appear to be any difference in her condition after supper when he went back. It will be remembered that Read swears that the will was written in the testatrix's house between eight and nine o'clock in the evening, and that Beegle swears that it was about nine o'clock at night when Harvey came to his house and told him that his mother wanted to see him. And he further testifies that the will was executed in twenty or thirty minutes after he went into the house, which was only about one hundred and fifty yards from where he lived. The 3d of April was Saturday. Mrs. Snover says on that day, while she was there, the testatrix expressed a great desire to see her son William. This fact is of some importance in

fixing the time. It appears too clearly to admit of any doubt whatever that both Susan and her mother-in-law are entirely mistaken in regard to the testatrix's condition on the 1st of April; that, so far from being in the condition in which they testify she was on that day, she was up and about the house, engaged in household duties, and entirely competent to transact business.

George F. Snover and his son Lemuel called at her house about sunset of that day. The business of the former was to pay her some interest which he owed upon a note of his which she held. He testifies that Harvey was there with her, and no one else; that when he went in she and Harvey sat by the table, eating; that Harvey rose and gave him a chair, and he asked how she did, and she replied that she had been about as she had been, only that she had no use of one arm much. He says he waited while she was eating, and told her he had come to pay the interest on the note; that she then told Harvey to go and get the note, and he asked where it was, and she told him somewhere in the trunk, and he got the note and brought it to her; that the interest was $42, and he counted out that sum all in gold, except $2 in silver, and that she remarked that that was more gold than she had ever seen in her life; and he then and there endorsed the interest on the note, and she took up the money after he had made the endorsement. He further says that he talked to her about general topics, and told her if she wanted any more of the money he would pay her some of the principal, and she asked Harvey if he thought they could get along without any more than the interest which he, Snover, had paid, and Harvey said he guessed they did not want any more; and then she said if the rest would only come and pay their interest as the witness did they could get along. He says that she mentioned the fact that Elias Snover owed her some money, and said she did not think they would ever get anything from him. He adds that from what he saw and heard that day she answered him correctly, and seemed as sensible as she well could be, though her voice was a little lower in tone than it had been,

and although he was a little hard of hearing, he could hear everything she said.

He further says that at that visit she was baking cakes on the stove, and reached and got the cakes with her left hand, without getting up, but that she had no use of her right hand, and had it lying on the table. His son Lemuel testifies to the same thing substantially. The note, with its endorsement, is produced, and, as before remarked, it appears too clearly to be doubted that the Swishers are entirely mistaken in their testimony as to the visit of the 1st of April, and the condition of the testatrix on that day. It is also very probable that the doctor, Elias Snover and his wife are all mistaken as to the time when the sickness of which they speak occurred. Harvey says that it was not on Friday, the 2d, but Friday, the 9th, that his mother was taken down to her bed. Susan says that she stayed all night on Saturday night, the 3d of April. Harvey says that it was the 10th, and not the 3d. She says that Elias Snover was there then, and the latter says that testatrix's son William was there on Sunday. Now Harvey swears that it was on the 9th of April, Saturday morning, that he sent word to his brother William, at Newton, that his mother was sick. He also swears that his brother William sat up with his mother on the following Sunday night. It is to be observed that neither Dr. Johnson nor any other of the witnesses on the part of the caveator appear to have any means of fixing the time of their visits to the testatrix, except from mere unassisted recollection, and they testified in November, 1881, about a year and a half after the occurrences. The doctor makes no reference to any charge or other memorandum in his books, nor to any incident enabling him to speak with positiveness as to the time when he made the visit, which he says he thinks was on the 2d of April. Nor does he, indeed, undertake to speak positively as to the time. His language is, " My impression is that it was on Friday, April 2d." And it is obvious, from the character of his testimony on the subject, that while he speaks according to his best recollection, he speaks only from unaided memory, without confirmation of any kind, except such as is to be derived from the testi-

Barker *v.* Barker.

mony of the other witnesses. They, too, in like manner, speak only from recollection, and, like him, give their impressions as to the time.

It is certain, as before stated, that the Swishers are entirely mistaken as to their alleged visit on the 1st of April, and this fact detracts greatly from the value of their testimony as to the time. A careful examination and consideration of the testimony leads me to the conclusion that these witnesses on the part of the caveator are mistaken as to the time of their visits, and that those visits took place one week later than the time which they have fixed. And here it may be remarked that the witness Elias Snover appears to be at enmity with Harvey. The latter testified, apparently without objection being made to the testimony, that in June, 1881, just before he was coming down to prove the will, Snover approached him when he was alone, and referring to the fact that they were without witnesses to their conversation, proposed to him that if he would give up to him, Snover, his note of $150 held by the testatrix, he, Snover, would be with him in the controversy; and added that otherwise he was going in with Jacob, who had promised that if he got the estate into his hands he would receipt the note and give it up to him; that he, Harvey, told Snover he was afraid to do any such business, and he adds that they had no further conversation, and that he had not spoken to Snover from that time to the time when Harvey gave his testimony. No effort was made to contradict this statement in any respect.

There is evidence in the testimony of Susan Swisher, and of Elias Snover, that the testatrix denied, after she had recovered from the severity of her sickness, that she had made any will at all, and that she said that she would make none, but would leave her children to share equally in her property. This evidence is competent to show that the will is spurious and had never been executed by the testatrix, and is competent to show want of testamentary capacity when the will was executed, but is not competent to show undue influence on the part of Harvey. Of itself, however, it is obviously not conclusive on either of the former heads, and there is no attempt to prove undue influence in

the case. The weight of the evidence is clearly in favor of the validity of the will. The decree will be reversed, and the paper admitted to probate, The costs of both sides, both in the court below and here, and a counsel fee of $100 to each side, will be paid out of the estate.